UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
JASELINE HAEYE ZHENG,

                         Plaintiff,                    **MEMORANDUM**
                                                       **AND ORDER**
             -against-                    CV 22-7260 (ARL)

COMMISSIONER OF SOCIAL SECURITY,

                         Defendant.
-----------------------------------------------------------------X
**LINDSAY, Magistrate Judge:**

         The plaintiff, Jaseline Haeye Zheng ("Zheng"), brought this appeal pursuant to the Social

Security Act, 42 U.S.C. § 405 et seq. (the "Act"), challenging a final determination by the

Commissioner of the Social Security Administration that she was ineligible to receive Social

Security disability insurance benefits.  Before the Court are the parties' cross motions for

judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  For the reasons set forth below, the

plaintiff's motion is granted, the defendant's motion is denied, and the matter is remanded for

further administrative proceedings, including a de novo hearing and new decision.

## BACKGROUND

         The following facts are drawn from the parties' Joint Stipulation of Facts.

      **1.**       **Factual Background**

         Zheng is 27 years old and claims to have become disabled almost six years ago on June 1,

2018.  Tr. 224.[1]  She alleges that she has an anxiety disorder with memory and social issues.  Tr.

15.  Zheng served in the U.S. Marine Corps between October 27, 2014 and October 26, 2018.

Tr. 282.  Prior to serving in the military, Zheng worked as a cashier at a McDonald's restaurant

---

[1] Tr. are citations to the Administration Transcript found at ECF No. 8.

and was a teen tutor at a public library.  *Id.*  Zheng graduated from college in 2020 and, at the time of the hearing, was attending an MBA program at St. John's.  Tr. 15, 49-51.

### A.       Zheng's Medical Record

Prior to her June 1, 2018 alleged disability onset date, Zheng attended medical visits for various complaints while still on active duty.  Tr. 370-539.  For example, in August 2017, Zheng was seen at the Naval Health Clinic at Cherry Point complaining of irregular cycles and spotting.  Tr. 486-88.  She indicated that she and her husband had recently started trying to conceive a child.  *Id.*  In the assessment/plan, the practitioner noted that her condition was most likely secondary to stressors/hormonal changes.  Tr. 488.  In September 2017, she returned to the clinic three weeks pregnant and requested a therapy referral for stress management.  Tr. 463.  However, two months later, in a questionnaire, Zheng reported that the stress-related issue had been resolved.  Tr. 408.  She also answered yes in response to the following question on the form: "Are you planning to separate or retire within the next year from Active Duty or Reserve Duty (activated for greater than 30 continuous days) or do you intend to file a claim for disability compensation with the Veterans Benefits Administration?" Tr. 414-15.

In August 2018, two months after her alleged disability onset date, Zheng underwent a physical examination in connection with her anticipated separation or retirement.  Tr. 371.  She had no acute issues at the time and was assessed as fit for full duty.  Tr. 371.  A letter from the United States Marine Corps nonetheless mentions that Zheng's last day of physical work was on June 1, 2018, the alleged disability onset date, which is also the day before she gave birth to her child.  Tr. 113.  Specifically, the letter states:

> 1.  [Zheng's] last day of physical work was on 1 June 2018.  On 2 June 2018, she was admitted to the Carolina East Medical Center in New Bern, NC, where she gave birth to her daughter. [Zheng] and her daughter were released from the hospital on 4 June 2018.  Upon their release her maternity leave started

2

from 5 June 2018 to 23 August 2018.  During [Zheng's] maternity leave, she started the transition process to be honorably discharged from the Marine Corps.

2.  [Zheng] started her terminal leave from 24 August 2018 until her end of active service on 26 October 2018.

Tr. 113.

Sometime in 2019, Zheng then applied for disability benefits with the VA.  In a statement in support of her claim that she was suffering from posttraumatic stress disorder ("PTSD"), Zheng stated that her unit was deployed in Turkey where it was deemed unsafe and they were instructed to travel in pairs on base although there was no active combat.  Tr. 1297.  She claimed that Turkish civilians attempted to murder a service member who was walking alone.  Tr. 1297, 1299.  She also stated that there was active combat outside of the base, which housed nuclear arsenals.  Tr. 1297.  She indicated that this caused her "fear for her life." Tr. 1299.  She also related that she sustained multiple injuries and other medical issues during her service, such as breaking her collar bone during martial arts training, and had to undergo surgery for a breast tumor after treatment for it was delayed when "[t]he mission was placed above my medical needs," such that the "residual medical issues and lack of care deeply affected [her]." Tr. 1297.  Zheng further reported that, at one point, she had an appointment to see a therapist, but it never happened so she had no relevant mental health history to provide.  Tr. 1298.  Finally, she indicated that she was taking online college courses.  *Id.*

On April 5, 2019, Rodwan Mahfouz, M.D., a psychiatrist, reviewed Zheng's Veteran Affairs ("VA") records and performed a Compensation & Pension Exam ("C&P") in connection with her application to the VA.  Tr. 1294-303.  Dr. Mahfouz opined that Zheng had many criteria of posttraumatic stress disorder (PTSD) but did not meet the Criterion B for PTSD.  *Id.* Specifically, he noted that Zheng denied having intrusive memories, flashbacks or dreams and

3

reported that she actively tries not to think about past trauma and is successful keeping it out of her mind. *Id.* Dr. Mahfouz did conclude, however, that Zheng met the Criterion A for PTSD, in that she directly experienced traumatic events and witnessed in person traumatic events. Tr. 1300. He also determined that Zheng met the Criterion C for PTSD in that she persistently avoided or made efforts to avoid distressing memories, thoughts, or feelings about or closely associated with the traumas and avoided or sought to avoid external reminders that arouse distressing memories, thoughts, or feelings about or closely related to the traumas. *Id*. Dr. Mahfouz further found that Zheng exhibited the Criterion D for PTSD in that she exhibited persistent and exaggerated negative beliefs or expectations about herself, others, or the world; persistent, distorted cognitions about the cause or consequences of the traumatic events that led her to blame herself or others; persistent negative emotional state; markedly diminished interest or participation in significant activities; and feelings of detachment or estrangement from others. *Id*. In addition, Dr. Mahfouz determined that Zheng met the Criterion E for PTSD in that she exhibited irritable behavior and angry outbursts (with little or no provocation) typically expressed as verbal or physical aggression toward people or objects; hypervigilance; exaggerated startle response; problems with concentration; and sleep disturbance. Tr. 1301. Finally, Dr. Mahfouz found that Zheng met the Criterion F through I for PTSD in that the disturbances she described had lasted more than one month; caused clinically significant stress or impairment in social, occupational, or other important areas of functioning; were not attributable to the physiological effects of a substance or another medical condition; and were the result of the traumas she suffered in the military. *Id.*

Dr. Mahfouz also concluded that Zheng suffered from another mental disorder - Adjustment Disorder with Mixed Anxiety and Depression, Chronic, and Agoraphobia without

4

Panic Disorder.  Tr. 1294-95.  He noted that he could not state which of Zheng's impairments caused each of her symptoms because "[a]djustment disorder with mixed anxiety and depression and [a]goraphobia . . . share overlapping symptoms of cognitive/concentration, mood and sleep disturbances [and] it is not possible to differentiate what symptom(s) is/are attributable to each diagnosis without speculation." Tr. 1295.  Dr. Mahfouz then opined that Zheng had an "[o]ccupational and social impairment [resulting in] occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks, although [she] generally function[ed] satisfactorily, with normal routine behavior, self-care and conversation." Tr. 1296. To this end, he advised that Zheng's symptoms included depressed mood, anxiety, suspiciousness, panic attacks that occur weekly or less often, chronic sleep impairment, mild memory loss, such as forgetting names, directions, or recent events, flattened affect, disturbances of motivation and mood, difficulty in establishing and maintaining effective work and social relationships, difficulty in adapting to stressful circumstances, including work or a work-like setting, suicidal ideation, obsessional rituals which interfere with routine activities, low appetite and memory/cognitive changes.  Tr. 1301-02.

At the time, Zheng also had positive findings in connection with her mental status exam ("MSE") including, slight dysthymia, anxiety, slightly irritable mood with congruent constricted/blunted and anxious affect, anxious tone and increased quantity of speech, thoughts content consisting of sadness, anxiety, irritability and ruminations, and decreased and disrupted sleep.  Tr. 1302.  Other findings showed that Zheng was friendly, cooperative, maintained fair eye contact, had speech with normal rate and volume, denied any suicidal ideation, had fair insight and judgment, and had a coherent, logical, and organized thought process.  Tr. 1302.

5

Based on all of the above, Dr. Mahfouz concluded that "[Zheng's] symptoms did not meet the diagnostic criteria for PTSD under the DSM-5 criteria but that her claimed anxiety condition, depression and sleep disturbances fell under the diagnoses of Adjustment Disorder with Mixed Anxiety and Depression and Agoraphobia, and thus, she was at an increased risk of causing harm to herself and should be considered an increased but not current imminent risk.  Tr. 1302.

Zheng underwent a second C&P Exam on June 11, 2019, performed by Susan Carver, Psy.D ("Carver").  Tr. 1304-14.  Dr. Carver also reviewed Zheng's VA file and commented that Zheng had reported fear for her life while deployed in Turkey, an incident when she felt mistreated by a supervisor and an attempted overdose on prescription medication, which she had not previously reported.  Tr. 1307, 1311.  Dr. Carver similarly diagnosed Zheng with Adjustment Disorder with Mixed Anxiety and Depression and Agoraphobia without Panic Disorder.  Tr. 1304, 1311.  She stated in her report that

> [Zheng] reports that she is anxious and depressed, with irritable mood and social isolation.  She spends most of her time in childcare responsibilities and taking courses, with support by extended family.  She reports chronic sleep disturbance (frequent waking) but is able to fall back asleep.  She reports that the sleep disturbance has slightly lessened in severity in past two months since couple got their own apartment.  She reports some marital discord.

Tr. 1307.  Dr. Carver further noted that Zheng claimed that she had anxiety and depression while in active military services, had passive suicidal ideation and had attempted to overdose on prescription medication while serving at Camp Lejeune but would not kill herself because she had a child to care for.  Tr. 1307-08.  Dr. Carver also noted medical diagnoses of tinnitus, hearing loss/changes, broken collar pain, lower back pain, bilateral ankle sprain/injury/pain, and bilateral hip pain.  Tr. 1305.

Dr. Carver opined that Zheng had an "occupational and social impairment with reduced reliability and productivity." Tr. 1306.  To this end, Dr. Carver stated that Zheng's symptoms

included, depressed mood, anxiety, suspiciousness, chronic sleep impairment, mild memory loss, such as forgetting names, directions, or recent events, difficulty in establishing and maintaining effective work and social relationships, difficulty in adapting to stressful circumstances, including work or a work-like setting, inability to establish and maintain effective relationships, suicidal ideation, and obsessional rituals which interfere with routine activities.  Tr. 1310.  Dr. Carver further observed that Zheng exhibited a dysthymic affect with mildly anxious mood and became tearful when recounting service-related triggers but was otherwise well-groomed, cooperative, maintained appropriate eye contact, had no psychomotor abnormalities, had intact thought processes, and had unremarkable, clear, and normal speech.  *Id.*

Three days later, on November 18, 2019, the VA determined that Zheng's impairments of Adjustment Disorder with Mixed Anxiety and Depression and Agoraphobia without Panic Disorder were service connected disabilities which caused her to "have occupational and social impairment with reduced reliability and productivity."  Tr. 109.  The VA noted in that report that Zheng had applied for a vocational and rehabilitation and employment program, but it was determined that employment, at the time, was not a feasible goal for Zheng.  *Id.*  Specifically, the VA's vocational rehabilitation program report stated:

> Analysis does support a finding that the individual is significantly impaired in their ability to participate in a program and achieve rehabilitation. [] Zheng's disabilities, aptitudes, history, and personal circumstances were carefully reviewed to determine if there are any factors, which could interfere with the individual's ability to participate in a program of rehabilitation, or factors, which could impede a successful rehabilitation outcome.  Factors were found which cause [] Zheng to need intensive rehabilitation services to overcome significant barriers to improvement. These include the above indicated [sic.] obstacles that add to the impairments of the Individual's disabilities.  The service-connected disability contributes to a serious employment handicap in an identifiable, measurable, or observable causative way.

Tr. 109.  Thus, the VA found that Zheng was "unable to obtain and maintain gainful employment," and "granted entitlement to a total compensation evaluation based on unemployability."  Tr. 109.  The VA further determined that Zheng was unemployable as a result of her service connected disabilities and, based on the medical evidence reviewed in connection with her claim, it was unlikely that her disabilities would improve to the point where she would be employable in the future.[2]  Tr. 110.  As a result, the VA concluded that Zheng's disability was permanent.[3]  *Id.*

Shortly thereafter, on December 3, and December 6, 2019, Heather Watson-Mott, LCSW ("Watson-Mott"), a social worker at the Northport VA, telephoned Zheng to schedule weekly psychotherapy sessions.  Tr. 636-37.  It is not clear from the record if she actually scheduled any sessions at that time.  However, on March 9, 2020, Zheng was seen by Cherian Alexander, M.D. ("Alexander"), at the Northport VA, for complaints of depression and lower back pain.  Tr. 633-35.  Because the visit with Dr. Alexander was considered a primary care visit, Zheng advised that she wanted "to be seen by mental."  *Id.*  As such, Dr. Alexander requested a mental health consultation.  Tr. 635.

Two weeks later, during a nutrition consultation, Zheng mentioned that she was not currently employed and was a full-time student.  Tr. 620.  She said she lacked time to exercise due to taking care of her child and her schoolwork.  *Id.*  She discussed her diet and mentioned that she did the shopping and cooking.  *Id.*

On April 10, 2020, Watson-Mott again telephoned Zheng to schedule a mental health consultation and advised her that "due to COVID 19 all CBOCs were currently closed."  Tr. 608-

---

[2] Notably, the report acknowledged that "Employers likely may choose a candidate with more recent work history suggesting motivation to gain employment." Tr. 109.
[3] By that point, Zheng had submitted a claim for "Individualized Unemployability." Tr. 109.

09.  Zheng was informed that she had an option to receive services via Telemental Health from a VA provider if availability existed or thru Community Care.  *Id.*  Zheng wanted to receive care directly from the VA, so Watson-Mott agreed to follow up when availability existed.  Tr. 609. During a medical visit the same day, Zheng reported that she was currently going to school full-time for legal studies and was also a full-time mother.  Tr. 610.

On May 10, 2020, the VA confirmed that Zheng had a service-connected disability rated at 90%; that she had been found to be unemployable by the VA; that her disability was "total and permanent"; and that she became disabled on October 27, 2018, the day her active duty had officially concluded.  Tr. 111.  Records from the Northport VA Hospital similarly indicated that Zheng had a 100% service connected disability rating, with her Chronic Adjustment Disorder alone accounting for a 70% rating.  Tr. 653, 655, 660-66, 663.  Three days later, Lauren Fitzgerald, Psy.D. ("Fitzgerald"), performed a mental health assessment of Zheng via telephone, due to COVID-19.  Tr. 591-96.  Dr. Fitzgerald reported the following:

> [Zheng] is a 90% [Service Connected disabled] Marine veteran.  She reports onset of symptoms of anxiety and depression while serving in the Marines. She spoke with a Chaplain once for support and began the process for mental health connection while in service but was discharged prior to initiation of therapy.  She describes generally feeling anxious, hypervigilant, fearful, and irritable with periods of feeling sad and worthless.  She describes having very little patience, is uncomfortable and avoidant of crowded areas, and is highly reactive to loud noises.  She denies a history of traumatic events experience before, during or after service.  She enlisted in the Marines following HS graduation at age 17, also the year she married her husband.  She lives with her husband and their nearly two year old daughter, and they just learned that she is newly pregnant with their 2nd child.  She experiences feelings of happiness related to new pregnancy and denied this as a factor in increased stress and anxiety.  She notes that her symptoms began during service and have persisted; environmental changes due to covid-19 have actually improved some of her symptoms as she is not needing to leave her home much or be around others, activities which increase her anxiety.

Tr. 595.  Dr. Fitzgerald diagnosed Adjustment Disorder with Mixed Anxiety and Depressed Mood.  Tr. 594.  Dr. Fitzgerald also noted a prior suicide attempt in 2015, specifically stating, "Veteran overdosed on prescribed oxycodone in 2015.  She was brought to the ER by her husband, treated, and discharged." Tr. 591.  She further reported that Zheng's suicide attempt was prompted by a "period of stress and following argument with husband." Tr. 592.

Nonetheless, Dr. Fitzgerald concluded that Zheng was at "Low ACUTE Risk" of suicide because she denied current active ideation and had many protective factors, including a two-year-old daughter and a new pregnancy.  Tr. 591, 593.  She did, however, note that Zheng had an intermediate chronic risk due to her past suicide attempt, risk factors of her mental health diagnosis, her chronic pain and her difficulty in transitioning to civilian life since her discharge in October 2018. *Id.*   During the session, Dr. Fitzgerald "[e]xplored [Zheng's] daily routine and engagement in self-care," and recommended that she consider activities such as reading a book alone or going for a walk in the neighborhood.[4] Tr. 595.

On June 3, 2020, Dr. Fitzgerald reported that Zheng's depression had improved with her pregnancy and advised her to return to treatment if her mood deteriorated.  Tr. 587.  Zheng reported that she started jogging outside, which reduced stress and improved her mood.  *Id.*  She noted that she had since stopped jogging due to morning sickness and not feeling well while running.  *Id.*  Dr. Fitzgerald recommended other activities, like walking.  *Id.*  At the time, Zheng denied having any symptoms of depression.  *Id.*  She also reported decreased stress levels since she was home more often, that she was generally feeling content with her daily life, and that she did not have a need for psychotherapy.  *Id.*

---

[4] That same day, Zheng also attended a Women's Health visit after she had taken a home pregnancy test. Tr. 596. Zheng reported that she had been trying to conceive.  Id.

Approximately two months later, on July 29, 2020, Watson-Mott conducted a PHQ-9 Depression Screening and assessed for Zheng a score of 15, indicating moderately severe depression. Tr. 570-71. She noted that Zheng reported having thoughts that she would be better off dead or of hurting herself "several days" in the prior two weeks. *Id.* Specifically, Zheng described her suicidal ideation as "Thought comes when I argue with my husband, If I wasn't here this would be easier." Tr. 567. Watson-Mott also conducted an Anxiety Screening and assessed a score of 17 out of 21, "meriting active treatment for anxiety." Tr. 569. Watson-Mott found that, because Zheng had had suicidal thoughts in the prior 90 days, Zheng was at low acute but chronic risk for suicide. Tr. 567-68.

The following day, Watson-Mott performed another mental health evaluation of Zheng. Tr. 565-67. Watson-Mott noted that Zheng was "90% SC for medical and [Mental Health] conditions," and that her chief complaints were anxiety, depression, anger, sleep difficulties, and excessive worry. Tr. 656. Watson-Mott further reported that Zheng was "currently unemployed as she [was] expecting her second child." Tr. 565. In addition, Watson-Mott stated:

> In respect to her anxiety, [Zheng] reports extreme panic attacks, excessive worrying. She notes having her husband check constantly to make sure doors and windows are locked. She disclosed not always being aware of her anxiety only when a family member or friend makes her aware . . . She shares depression is a result of being sad and angry, whether due to her anxiety or because she yelled for no reason. [Zheng] explains all this began post military and desires to make a change. She reports many of her symptoms are exacerbated by her pregnancy and anticipates improvement once she delivers. She notes her pregnancy causes her energy level to be low, therefore she does not do much around the house, except basic necessities and care for her now 2-year-old daughter. This can sometimes lead to arguments with her husband. At those times she reports feelings of guilt that she is a bad mother and also thinking that it would be easier if she was not around. However, [Zheng] notes no desire to take her life, as her children keep her going.

Tr. 565-66. Watson-Mott also noted reports of verbal abuse during military service. Tr. 566.

11

Nevertheless, she found Zheng to have a euthymic mood with congruent affect. *Id*. She indicated that Zheng was frequently interrupted while monitoring her daughter but when she was attentive, Zheng eagerly shared her thoughts and feelings about anxiety and depression, had normal speech, had good insight and judgment, had good attention and logical thought processes and denied any current suicidal thoughts. *Id*. As had her prior treating practitioners, Watson-Mott diagnosed Zheng with Adjustment Disorder with Anxiety and Depression. *Id*.

Following a session on August 5, 2020, Watson-Mott again noted that Zheng had a euthymic mood with congruent affect and indicated that the visit had focused on psychoeducation about Zheng's diagnosis of Adjustment Disorder. Tr. 701-02. She stated that Zheng's mental status also showed normal speech, good judgment, good insight, logical thought process, good attention, and good concentration. Tr. 701.

Shortly thereafter, Watson-Mott prepared a treatment plan for Zheng. Tr. 697-701. In the plan, Watson-Mott noted that Zheng's presenting problem was that she reported experiencing extreme panic attacks, excessive worrying, and depression caused by her feelings of being sad or angry. Tr. 698. The treatment goals included decreasing worry, angry outbursts, and anxiety; being more relaxed; and returning her sense of self. Tr. 699. The relevant diagnoses listed in the plan included Adjustment Disorder Mixed with Anxiety and Depression and Low Back Pain. Tr. 699.

Watson-Mott spoke to Zheng again on August 12, 2020 and again noted a euthymic mood and congruent affect. Tr. 696-97. She indicated that Zheng "shared regarding her anxiety and admitting it [was] a result of not being able to express herself while serving in the military." *Id*. Specifically, Zheng recalled often making requests, being denied then going to her room and crying, yelling, being overwhelmed and frustrated. *Id*. She noted that she "keeps things in,"

which ultimately leads to anger.  *Id*.  The mental status examination performed that day included findings that Zheng convincingly denied suicidal ideation and had normal speech, good judgment, good insight, logical thought process, good attention, and good concentration.  Tr. 696.

Zheng saw Watson-Mott for three additional visits between August 19, 2020 and September 16, 2020.  Tr. 685-86, 691-92, 695-96.  Among other things, Watson-Mott observed a euthymic mood with congruent affect and noted that Zheng was actively practicing her coping skills and was responsive to support and encouragement.  *Id*.  Zheng "described the [those] weeks as 'good.'" Tr. 691.  At times, Zheng reported struggling to keep up with her child and daily chores but denied suicidal ideation and had normal speech, good judgment, good insight, logical thought process, good attention, and good concentration.  Tr. 685-86, 691-92.  Zheng did, however, reveal feeling overwhelmed and that she did not have the time to complete the therapy sessions since she had limited help.  Tr. 686.

On October 22, 2020, Zheng was then seen at Winthrop Hospital for complaints of palpitations.  Tr. 768-70.  Her EKG was normal so she was discharged and instructed to see a cardiologist.  *Id*.  The following day, Annette Laietta, an RN, added a note regarding the Winthrop Emergency Room visit and reported "[Zheng] admits to feeling increased anxiousness and stress due to concern about heart palpitations and because she is very busy taking care of her toddler." Tr. 678-79.  The nurse also noted that Zheng admitted to not eating well and having a decreased appetite.  *Id*.  Finally, the nurse noted that Zheng did not wish to connect with Watson-Mott because she was overwhelmed and busy.  Tr. 679.

On October 28, 2020, Zheng was evaluated by Joseph Eichenbaum, M.D., a cardiologist. Tr. 1128-34.  During the examination, Zheng related that she was able to function normally and

13

do normal activity. Tr. 1129.   Dr. Eichenbaum found her physical examination to be

unremarkable.  Tr. 1129.  Dr. Eichenbaum reassured Zheng that her symptoms were common

during pregnancy, but since she was very concerned, he ordered "some ambulatory monitoring to

make sure that these rhythm disturbances [were] nothing significant." *Id.*  After two weeks of

ambulatory cardiac monitoring, he opined that further intervention was not necessary.  Tr. 1080.

On November 5, 2020, Zheng had a video visit with Eileen Hazell ("Hazell"), an

Advanced Nurse Practitioner.  Tr. 674.  Hazell reported that Zheng indicated that she had been

experiencing increased anxiety and stress trying to take care of her small child, keeping up with

the household and having the pregnancy.  *Id*.  She noted that Zheng had been in counseling but

had not been able to attend sessions since September because she needed to take care of her child

during the day.  *Id.*

Zheng does not appear to have seen a mental health professional in December but on

January 14, 2021, during a medical visit in anticipation of the delivery of her second child,

Zheng reported that she was in good spirits and denied thoughts of anxiety or depression.  Tr.

1029.  On January 31, 2021, Zheng gave birth to her second child at Winthrop Hospital and she

was hospitalized from January 31 to February 3, 2021.  Tr. 724-53.  Zheng reported that while

she had severe postpartum depression after her first pregnancy, during the current pregnancy, her

mood "ha[d] been stable with exception of [a] brief period [of] 1-2 days of suicidal ideation

without intention . . . due to family issues." Tr. 730.  She reported being excited about her second

child.  *Id*.

A psychiatric evaluation performed at that time by Joanne Hudkins ("Hudkins"), a nurse

practitioner, noted Zheng's history of anxiety, depression, and past suicide attempt.  Tr. 740.

Hudkins indicated that Zheng began experiencing anxiety and depression while in the Marines,

where she "was emotionally and mentally abused."  Tr. 741.  Hudkins further noted that Zheng

reported being prescribed Oxycodone in 2016 for a broken clavicle and then overdosing on those

pills in an attempt to commit suicide.  *Id*.  Hudkins also stated that Zheng had gone to the

hospital afterwards to get checked for abdominal pain and did not disclose her suicide attempt.

*Id*.  Hudkins recorded Zheng's admission that she had suicidal thoughts during both of her

pregnancies, but no plan to carry it out.  *Id*.

It appears that Zheng also reported that she left the military when she was pregnant with

her first daughter, and, after her daughter's delivery, had moved to New York, bought a house,

and had felt "more stressed out caring for a baby and moving to a new house." *Id*.  Zheng further

advised that during the pandemic in 2020, she "finally sought help . . . and started weekly

psychotherapy," which she stopped over the summer because she was "busy with the baby and

being pregnant with the second one." *Id*.  Nevertheless, Zheng reported depressive symptoms of

depressed mood and anhedonia, as well as anxiety symptoms of intrusive and worrying thoughts.

*Id*.  Zheng denied having panic attacks or disorganized thought or behavior.  *Id*.

During the evaluation, Zheng identified her employment history or status as

"homemaker." Tr. 743.  With respect to her mental status examination, Zheng was reported as

having a sad and pleasant mood and thought content with anxious preoccupation, but an

otherwise adequate appearance, cooperative attitude, good eye contact, normal psychomotor

behavior, normal speech, a well-organized thought process, intact memory, intact insight and

judgment, and good concentration.  Tr. 744.  Hudkins suggested Zheng consider starting Zoloft

(Sertraline) and Melatonin.  Tr. 741.  Zheng stated that she first wanted to discuss the

medications with her therapist.  Tr. 741, 744.

During a February 3, 2021 call to discuss maternity care coordination, Zheng said she was prescribed Zoloft to avoid postpartum depression, but that she did not have any signs or symptoms of it currently.  Tr. 1025.  She reported having situational depression and anxiety about her newborn's medical issues, however said "she is managing okay." *Id.*  In another call on the same day, Zheng expressed that she wanted to resume counseling.  Tr. 1022.  She mentioned that she had postpartum depression after her first baby "but she had no help at home." *Id*.  In contrast, her mother-in-law was, at the time, living with her for assistance.  Zheng denied any remote or recent suicidal ideation.  *Id*.  She was ambivalent about taking medication while nursing*.  Id.*

On February 4, 2021, Karin Lynn Olsen ("Olsen"), a registered nurse, followed up with Zheng concerning her mental health needs and Zheng advised that she was again seeing Watson-Mott.  Tr. 1021.  Zheng said she was "doing ok" and had started taking Zoloft.  *Id*.  She indicated that she had no prior history of taking psychotropic medication.  *Id*.  Zheng's psychiatric status was assessed as stable.  *Id*.  Then, on February 10, 2021, Zheng was evaluated by psychiatrist, Annama Jose, M.D. ("Jose"), at the Northport VA Hospital.  Tr. 1059.  Zheng reported a "[history of] bad postpartum depression" and that she had been prescribed Zoloft by her OBGYN.  *Id.*  The doctor noted that Zheng also reported a history of insomnia, anxiety, depressed mood, loss of appetite and "ongoing anxieties surrounding baby's safety," but that she was doing a lot better with the Zoloft.  *Id*.  Zheng denied symptoms of depression at the time*.  Id.*  She also denied a history of trauma.  *Id*.  Dr. Jose observed a neutral mood with congruent affect and reported an otherwise normal mental status examination.  Tr. 1060.  Dr. Jose diagnosed Zheng with Depressive Disorder NOS, and continued Ms. Zheng's prescription for Zoloft.  *Id*.

16

On March 8, 2021, Olsen followed up with Zheng to monitor her medications and Zheng advised that she had discontinued the Zoloft because she was breastfeeding and her infant was experiencing health issues.  Tr. 1017.  Zheng reported that she did not experience any side effects from discontinuing Zoloft and that she was emotionally managing well.  *Id*.  Two weeks later, during a maternity care call, Zheng again reported that both "she and baby [were] doing well, offered no concerns and had no questions.  Tr. 1014.  On March 25, 2021, Zheng then advised Olsen that she would not resume Zoloft until she was no longer breastfeeding.  Tr. 1011.  She said that "the second child [was] much easier, [and she was] doing ok." *Id*.

On April 7, 2021[5], Zheng saw Arielle Asman ("Asman") and Matthew Colin Williams, Ph.D. ("Williams"), who noted that she had complaints of anxiety and stress related to caring for her children; that she continues to struggle to find time for self-care and has limited social support; and that she reported having periods of low mood and significant fatigue.  Tr. 1002. During her mental status examination, the doctor observed a euthymic mood with congruent affect and pressured speech, but a PHQ-9 screening revealed moderate depression.  Id.  It was reported that Zheng had good attention and concentration.  Tr. 1002.  The medical professionals also assessed a low acute risk for suicide and noted that Zheng denied having any suicidal ideation in over a year.  Tr. 1000.  During that evaluation, Zheng also reported that she was "managing okay overall and ha[d] learned coping skills in the past that help her manage low mood and stress now." *Id*.  She indicated that she planned to return to therapy when she felt she had more time to devote to longer term therapy.  Id.

---

[5] The parties' stipulated facts misidentify the date of this treatment as 2018.

Approximately two weeks later, on April 28, 2021, Zheng advised Asman and Dr. Williams that "she [would] reach out to [the] VA or PCMH should she be interested in any services in the future." Tr. 998.  She stated that she was "busy with her two young children." *Id*. On April 30, 2021, Zheng then advised Olsen that she had still not resumed taking Zoloft due to breastfeeding but was emotionally managing well and was assessed as psychiatrically stable.  Tr. 992.  Similarly, during a call on June 11, 2021, Zheng reported that she was doing well, had no new complaints, and denied having anything in her life that was causing her stress or worry.  Tr. 986.

On July 2, 2021, Zheng then reported to Dr. Jose that she was doing "okay," and had an appointment scheduled for July 15, 2021.  Tr. 982.  She reported having "periodic anxiety surrounding her children's care but denied any other specific complaints or urgent needs. *Id*.  In a follow up tele-visit, Zheng also advised Olsen that she had resumed taking Zoloft and would continue taking it daily.  Tr. 1182.  During the call, Zheng reported that she was emotionally managing well and denied a "need for immediate mental health connection." *Id*.   She was found to be psychiatrically stable.  *Id*.

During a follow-up session on July 15, 2021, Dr. Jose noted no depressive symptoms, but that Zheng had ongoing anxiety surrounding her baby's health issues.  Tr. 1180.  He stated that the Zoloft was helping and he continued the prescription.  *Id*.  It appears that Zheng reported that she "[felt] a lot better with the Zoloft." *Id*.  With respect to her mental status examination, Zheng reported her mood as "ok;" and indicated that she had normal speech, linear and spontaneous thought process with unremarkable thought content and maintained attention.  Tr. 1181.

The following week, Deidra Frum-Vassallo, Ph.D. ("Frum-Vassallo") and Sara Garvuso ("Garvuso") administered an Ediburgh Postnatal Depression Scale and assessed a score of 19.

Tr. 1187-88.  According to the record, Zheng answered "Question 10 that assesses 'thought of harming' oneself" in a positive direction, and thus, Dr. Frum-Vassallo and Garvuso noted that additional clinical assessment was indicated.  *Id.*  Specifically, they reported that "[m]others who score above 13 are likely to be suffering from a depressive illness of varying severity." *Id.*  The next day, Dr. Frum-Vassalo and Garvuso noted a normal mental status examination, but assessed a moderate/significant sleep impairment, mild impairments with friends, family, recreation, and physical activities.  Tr. 1178.  They did, however, assess no work impairment and a low acute risk for suicide.  Tr. 1176, 1178.

At the time, Zheng's main complaint was post-partum depression.  Tr. 1178.  She stated in this regard:

> I don[']t want to do anything, I have two kids. It just brings me down, and I can[']t get anything done, it[']s stressful, I still have kids and responsibilities. The adjustment the first time around was difficult, my family and husband didn[']t help.  I learned a lot since then, so it's a little more manageable.

*Id.*  Dr. Frum-Vassallo's and Garvuso's mental status examination findings included euthymic mood, normal speech, and good attention and concentration.  *Id.*  Indeed, Zheng mentioned that she was "going to begin school again in a few months." Tr. 1179.

On August 24, 2021, Zheng had a psychotherapy session with Jeanette Richards LCSW ("Richards") who noted: "'Anger issues–very huge . . .' [Zheng] reported that she gets into near daily arguments with her husband and yells at her family frequently.  In addition, she intermittently feels depressed and/or anxious.  She reported having poor concentration and forgetting things." Tr. 1194.  Richards observed that Zheng "was noted to engage in yelling while disciplining her 3 year old child." Tr. 1197.  A mental status examination performed during the session showed that Zheng had a mildly irritable mood with congruent affect, was generally cooperative, had normal speech, distractible attention, impaired concentration, had

normal memory, had normal thought processes and had unremarkable thought content.  Tr. 1196-97.

Richards further noted that Zheng was currently enrolled in a full time MBA program where she was studying finance.  Her anticipated completion date was August 2022. Tr. 1193.  She identified her employment status as "unemployed and not seeking employment at the present time."  *Id*.  Zheng mentioned that she had financial concerns in paying out of pocket for medical care for her three-year-old daughter, which was not covered by insurance and for which she and her husband were obtaining financial assistance from her family.  *Id*.  Richards further reported that Zheng was caring for her two daughters during the session and she strongly recommended obtaining childcare for the psychotherapy sessions.  Tr. 1197.  Zheng responded that she would speak to her husband about caring for the children after he finished work.  *Id.*

On September 22, 2021, Zheng began treatment with Efthia Linardatos, Ph.D. ("Linardatos") for her anxiety and major depressive disorder.  Tr. 1161-62.  According to Linardatos' records, Zheng had experienced a "single episode" of anxiety and depression on September 17, 2021.  *Id.*  She explained to Dr. Linardatos that increasing life stressors culminated to overwhelming feelings of anxiety and hopelessness on September 17 that led to suicidal ideation – "wanting to end [her] life with a plan to crash her car or drown by jumping into the ocean over a cliff..." *Id*.  She denied current suicidal ideation and indicated that she wanted to continue to drive.  Tr. 1162.  Specifically, she advised Dr. Linardatos that she drove on Saturdays to attend class.  *Id*.

During the session, Zheng also reported that her brother and his girlfriend had moved into her home increasing her anxiety, and her mother had come to help, but they ended up in an argument.  *Id*.  Zheng "explained that her mother said some 'very hurtful things' and when she

20

refused to leave, despite Zheng threatening to 'grab a knife,' she decided to go instead." *Id*. Dr. Linardatos reported:

> She indicated that she got into her car with only her underwear, bra, and a vest on.  She experienced thoughts of killing herself by crashing her car, but concerns about hurting other people led to aborting this plan. She then drove to beach (Jones Beach) and considered drowning, though concerns about not being successful and causing irreversible damage to herself eliminated this plan.

*Id.* Zheng also mentioned that she and her husband considered "signing [] divorce papers" secondary to their stressors. *Id*. She "speculated that the increasing demands from her extended family . . . exacerbated her stress of caring for her [two] children, managing her household and going to school (online/MBA)." *Id*. She also said that she did not want to have contact with her parents. *Id*.

The MSE conducted during the session revealed an anxious mood with congruous affect, and spontaneous and at times pressured speech. *Id*. Zheng was friendly and engaged, though distracted initially because she was attending to her children during the session. *Id*. She had good hygiene and grooming. *Id*. She perseverated on extended family dynamics, but otherwise had a clear and logical thought process. *Id*. Dr. Linardatos assessed an Intermediate Acute Risk of suicide and a High Chronic Risk of suicide. Tr. 1163-64. Dr. Linardatos noted that Zheng was motivated to work on enhancing her mental health and overall quality of life, had no history of psychiatric hospitalizations or non-fatal self-harming behaviors, and was willing to actively engage in mental health care. Tr. 1164. With respect to coping strategies, Zheng listed schoolwork, Netflix, taking a walk, and taking a car ride with her husband to the mall or the zoo. Tr. 1165-66.

Dr. Linardatos followed up with Zheng on September 23, 2021 to create a safety plan, at which time Zheng advised that "her main strategies [to regulate stress] include thinking about her

children and 'trying to suppress . . . [her] feelings,' though she indicated that this approach comes along with problems such as impacting her concentration/memory." Tr. 1160-61.  While discussing mental and behavioral processes for relief from stress, Zheng "expressed concern about 'losing [her] children', should she report suicidal ideation or report to an ER.  She also asked whether individuals with [mental health] problems are at risk of being institutionalized." Tr. 1161.

On September 23, 2021, Dr. Jose followed up with Zheng and she "reported that she had been overwhelmed by all added stressful events which had led to an 'episode' on [September 17].  She explained that she felt overwhelmed, felt hopeless and anxious on [September 17] that led to suicidal ideation.  She adamantly denied any current [suicidal ideation], plans or thoughts." Tr. 1160.  Dr. Jose noted that [Zheng] had a linear and spontaneous thought process with unremarkable thought content, and that she showed no evidence of acute distress during the communication.  *Id*.  Dr. Jose increased Zheng's dosage of Zoloft.  *Id*.

On September 29, 2021, Dr. Linardatos reported that Zheng had tried to call her mother, but it did not go well and that her plan to have her mother help with her childcare would not work.  Tr. 1158.  Zheng said she had moved back to New York with the plan to have her mother help with childcare but was now realizing that her family exacerbated her stress, and she was not interested in reconnecting with her mother.  *Id*.  Dr. Linardatos' notes from the session state: "[Zheng reported that she continues to experience stress secondary to parenting responsibilities, schooling and marriage . . . She shared that she is struggling with her schoolwork, but would like to at least finish this semester." *Id*.  Zheng mentioned to him that she planned to ask her husband's mother to babysit a few hours a week.  *Id*.  She stated that she was concerned that her husband was her "only support" and as a couple they "argue a lot." *Id*.

Dr. Linardatos also noted that Zheng was in a car with her younger daughter during the session, until joined by the husband and older daughter halfway through, and she discussed limiting distractions for sessions. *Id*. She reported that her mood was mildly dysthymic and anxious but her affect varied appropriately to content. *Id*. She further reported that Zheng was distracted by her daughter so her speech was spontaneous and pressured at times but she was friendly and engaged, had good hygiene and grooming, had a clear, logical, and sequential thought process, and denied any suicidal ideation. Tr. 1159.

In a consultation that took place on October 4, 2021, a social worker noted that Zheng had two young children without access to childcare and required benefit counseling, including for Social Security Disability. Tr. 1151. Two days later, Zheng saw Dr. Linardatos, who noted that Zheng's mother-in-law was now helping with the children and she was doing better. Tr. 1150. She indicated that her mood was mildly neutral, her affect varied and she continued to be distracted by her older daughter but she was friendly and engaged and had a clear, logical, and sequential thought process. *Id*.

Dr. Linardatos made similar observations on October 13, 2021. Tr. 1149. During that session, Dr. Linardatos reported that Zheng "discussed stress related to caring for her 2 young children (e.g., older child wakes up during the night), especially, because they have medical needs and her supports are limited. She is attending an online support group for parents of children with eczema, though she would be more interested in connecting to others locally face to face." *Id*.

In another call with a social worker on October 14, 2021, Zheng said that she had been unable to work and requested documentation for her Social Security Disability claim. Tr. 1148. The social worker noted that Zheng "verbaliz[ed] stress due to unemployment." *Id*.

Zheng saw Dr. Linardatos again on October 18, 2021 and complained of increased stress due to an upcoming school exam and her daughter's medical issues. Tr. 1147. Zheng advised that she was in the process of reapplying for Social Security Disability. *Id*. To this end, Dr. Linardatos reported:

> she shared that she applied initially about a year ago, but she was denied services. She indicated that she has not worked since she was discharged from the military secondary to her [mental health] challenges. Compounded stressful factors including, parental and school responsibilities make it reportedly even harder to access gainful employment at this time. [Zheng] asked whether it would be possible to get a letter from this writer in support of her SSD application [-] writer explained that she is not familiar with the process and will have to look into what it would entail, especially, as [Zheng] is new to this writer. She shared that the social worker is in the process of collecting relevant information from her [mental health] provider and will assist her [with] the required paperwork.

*Id*. With respect to her mental status examination, Zheng had a mildly anxious mood, was friendly and engaged, had normal speech, and had a clear, logical, and sequential thought process. *Id*.

On October 21, 2021, Zheng met with Dr. Jose who continued her prescription for Zoloft and instructed her to take Melatonin to help her sleep. Tr. 1143-44. Zheng denied having any depression symptoms at the time. Tr. 1143. She reported "anxieties surrounding [her] baby's safety and health," and stated that she felt "better with the Zoloft." *Id*. On her MSE, Zheng reported that her mood was "ok," she had normal speech, a linear and spontaneous thought process with unremarkable thought content and maintained attention. *Id*.

Her appointment with Dr. Linardatos on October 27, 2021 was cut short because her children were too distracting but she had no urgent mental health issues. Tr. 1141-42. Dr. Linardatos reminded her that she could receive psychotherapy in the community to access services more flexibly, but she was not interested. Tr. 1142.

During her session on November 1, 2021, Dr. Linardatos noted that Zheng's husband was being more supportive and they were looking into hiring help and seeking a child psychologist. Tr. 1141.  Her mood during the examination was neutral and had appropriate affect and humor, and she was friendly and engaged, had normal speech, and had a clear, logical, and sequential thought process.  *Id.*  Similarly, on November 22, 2021, Dr. Linardatos indicated that she continued to explore options to reduce stress related to childcare, especially, as her mother-in-law recently shared that she is not available to assist regularly.  Tr. 1272.  Zheng reported that "she [was] facing challenges with either 'shutting down' emotionally or having intense emotional responses to stress (e.g., agitation; impulsivity/shopping/onychotillomania) . . ." *Id.*

At the session on December 1, 2021, Zheng reported "that she and her husband [] decided not to hire privately for assistance in the home given their daughter's medical needs – she explained that her mother-in-law continues to offer some help once a week." Tr. 1271.  Zheng further reported that it continued to be very challenging to attend to her own self-care as her time was consumed by family responsibilities, especially, related to her elder daughter's needs.  *Id.*  She advised Dr. Linardatos that she was receptive to implement daily reminders to check in with herself about basic needs and meaningful activities.  *Id.*  She also advised that she was increasingly relying on her husband for emotional support and that 'going out of the house' often helped to decompress, though she does not have many opportunities to do so.  *Id.*

One week later, Dr. Linardatos noted increased stress secondary to Zheng's daughter's medical condition and that upcoming final exams were another stressor.  Tr. 1267-68.  During the session, Zheng asked for an evaluation for dyslexia and ADHD, noting " difficulties with forgetfulness and inattention which she seemed to recognize can also be related to anxiety." Tr. 1268.  Zheng stated that she was interested in an evaluation "to better 'understand' herself and

obtain accommodations for her college work." *Id*.  Zheng's mood was mildly anxious; her affect was varied appropriately to content; and her speech was spontaneous and mildly pressured at times.  *Id*.  Dr. Linardatos noted that. Zheng was friendly and overall engaged though distracted by her daughters at times and had good overall attention.  *Id*.

On December 10, 2021, Dr. Linardatos called Zheng after receiving a message "stating that she is 'super stressed' and is having difficulties 'processing [her] emotions . . ..'" Tr. 1265. During the call, they discussed strategies for coping with stressful situations.  *Id*.  Zheng described that she had to take her daughter to upstate New York for a medical appointment but was unable to meet with the doctor because her husband was not willing to assist with the kids; she was currently in upstate New York and denied any suicidal ideation, plan, or intent.  *Id*.

At another session three days later, Dr. Linardatos noted Zheng's complaints of ongoing "stressors related to childcare and marital discourse." Tr. 1264.  She reported to her that her increased stress on Saturday had triggered agitation and suicidal ideation.  *Id*.  Specifically, Zheng reported that on the prior Saturday she had gone outside to decompress and "considered 'getting hit by a car' while she was standing by the road." *Id*.  Zheng denied any suicidal ideation from the time of that incident.  *Id*.  Dr. Linardatos stated that she advised Zheng that "although she may not be able 'to stop [suicidal ideation,] she can continue to work on her responses to these thoughts and relevant feelings." *Id*.

In response, Zheng reported chronic difficulties with active suicidal ideation in response to stress during her military experience and noted that alcohol misuse was her main coping strategy.  *Id*.  Moreover, Zheng confirmed that she had good and bad days, and her husband confirmed "that she oscillates between 'blowing up' and withdrawing or 'getting quiet.'" *Id*. Zheng also mentioned that she was "appealing her SS disability decision and explained that she

will be sending relevant paperwork to her providers." *Id*.  Dr. Linardatos explored sources for childcare or other supports, but Zheng "denied interest." *Id*.  Her mood during the session was mildly anxious and dysthymic with a congruent, at times tearful, affect but she was friendly and engaged, and had overall good attention.  *Id*.

Nonetheless, four days later, Dr. Linardatos worked on an amended safety plan to address Zheng's suicidal ideation and added to the safety plan a reminder or self-coping strategy for Zheng to consider the short- and long-term negative impact suicide would have on her daughters. Tr. 1265.  That same week, Dr. Jose again diagnosed Zheng with Depressive Disorder NOS and Adjustment Disorder with Anxiety and continued her prescription of Zoloft.  Tr. 1261-63.  The mental status examination he conducted showed normal speech, reported "ok" mood, adamant denial of any current suicidal ideation, a linear and spontaneous thought process with unremarkable thought content and maintained attention.  Tr. 1262.

On December 17, 2021, Dr. Linardatos called Zheng for a "supportive call" and Zheng reported that she was doing "better."  Tr. 1260.  On December 20, 2021, Dr. Linardatos noted that Zheng called in late to her appointment because she and her family had been sick and she forgot.  Tr. 1259-60.  On December 27, 2021, Zheng advised Dr. Linardatos that she and her family were still recovering from their colds, resulting in reduced stress, although the doctor observed a mildly anxious and dysthymic mood and congruent affect.  Tr. 1258-59.  Zheng once again said that her main triggers for mood dysregulation and suicidal ideation were her daughter's medical conditions and marital discourse.  Tr. 1259.  During the MSE, Zheng's attention became distracted when her daughters entered the room but she was friendly and engaged, had spontaneous and normal speech, and had a clear, logical, and sequential thought process.  *Id*.

On January 5, 2022, Dr. Linardatos noted a complaint of "increased stress" with a panic attack because her in-laws had watched the children and her daughters had a reaction to the mother-in-law's perfume.  Tr. 1256-57.  According to Zheng, she had gone out with her husband that night and had the in-laws babysit; after this incident they decided not to have the in-laws babysit again and that they would instead do it on their own.  Tr. 1258.  Her mood that day was dysthymic and mildly anxious with congruent affect and her attention was distracted by her daughter.  Tr. 1257-58.  Dr. Linardatos did note, however that Zheng had been experiencing a decrease in stress since she stopped attending school.  Tr. 1257.

On January 6, 2022, Bertina Jackson, LPN, administered a PC-PTSD-5, which resulted in a score of 5–a positive score indicating PTSD.  Tr. 1254-56.  Zheng also had a Women's Health visit the same day, and the physician reported that psychiatrically Zheng had a normal mood and affect.  Tr. 1253.

During her therapy session on January 10, 2022, Dr. Linardatos noted that. Zheng exhibited a mildly anxious mood, but that she continued "efforts to practice adaptive coping skills with good effect overall." Tr. 1250-51.  Zheng missed her appointment on January 19, 2022, but Dr. Linardatos eventually reached her and she indicated that she was "doing ok." Tr. 1247.

On January 24, 2022, Dr. Linardatos reported that Zheng discussed her military experience during the appointment, which she described "in the context of power differential/'abuse of power.'"  She noted that Zheng expressed feelings of anger, regret and mistrust, but also recognized the potential for learning/personal growth and the power of choice going forward," and the doctor observed a mildly anxious mood with varied, sometimes tearful,

affect.  Tr. 1240-41.  In addition, Zheng was engaged, friendly, had normal speech and had good

attention.  Tr. 1241.

On April 5, 2022, Dr. Linardatos wrote a brief report for Zheng in which she stated:

> This provider has worked with Mrs. Zheng in individual psychotherapy from
> 9/22/21 to 3/28/22. She has a diagnosis of Anxiety Disorder, Unspecified and
> is endorsing difficulties with anxiety, low mood, poor concentration and
> memory, anhedonia, irritability, sleep disturbance, feelings of worthlessness,
> social withdrawal and difficulty adapting to stressful situations. This provider
> has known Mrs. Zheng in the course of psychotherapy that was initiated
> approximately 4 years after her last gainful employment. Thus, offering an
> opinion about her occupational functioning is limited. Mrs. Zheng is struggling
> with ongoing mental challenges (reported onset in 2018) and life stressors that
> could interfere with her ability to function effectively in the workplace at this
> time.

Tr. 1292.

## B.    The Examining Consultants

On January 27, 2021, Andrea Pollack, D.O. ("Pollack"), performed an internal medicine

consultative examination of Zheng.  Tr. 707-10.  Zheng reported various medical conditions

dating to as far back as 2015.  Tr. 707.  She was not taking any medications at the time and

reported that she was able to clean, do laundry, and shop.  Tr. 707-08.   Her examination was

normal apart from findings related to the fact that she was 39 weeks pregnant at the time.  Tr.

707-09.  Dr. Pollack diagnosed tachycardia, hyperlipidemia, reflux, pregnancy, diastases recti,

tinnitus, right shoulder and clavicle pain, bilateral leg pain, headaches, and a history of breast

tumor.  Tr. 709.  She opined that Zheng had a moderate restriction in lifting, carrying, pushing,

and pulling; and that she should avoid activities requiring heights, operating heavy machinery,

and heavy exertion and activities which may put her at risk for a fall.  Tr. 710.

The same day, Dana Savidge, Psy.D. ("Savidge"), performed a psychiatric consultative

examination of Zheng.  Tr. 712-18.  Zheng reported poor anger control, anxiety, depression,

trauma, and panic symptoms since serving in the Marines and advised Dr. Savidge that she had been receiving individual psychotherapy with a Marine Corp chaplain and had currently been treating weekly with a psychologist via telephone.  Tr. 713.  She said that she had never taken any psychiatric medications.  Tr. 713.

Zheng reported difficulty falling asleep, staying asleep, and insomnia; feeling lethargic and fatigued throughout the day; racing thoughts; headaches; anxiety; trauma symptoms; moderate intermittent depression; forgetfulness; irritability; dysphoric mood; loss of interests; impaired concentration and memory; poor anger management; occasional tearfulness; frustration; social withdrawal/isolation; psychomotor slowing; facial flushing; chest pain/tightness; rapid heartbeat; shortness of breath; dry mouth; difficulty swallowing; worry; restlessness; racing thoughts; and agoraphobia.  Tr. 713.  She also reported exposure to trauma when she was deployed to a combat zone and that she continues to experience triggers, avoidance of triggers, hypervigilance, hyper startle response, intrusive thoughts/memories, flashbacks, nightmares, anger outbursts; and distrust of others.  Tr. 714.  Zheng denied suicidal ideation currently or in the past.  Tr. 714.

Zheng further reported that, throughout her academic career, "[s]he excelled across scholastic domains." Tr. 712.  She said she was employed for the U.S. Marine Corp fulltime for four years.  Tr. 712.  She reported that she left "due to an end of contract and service." Tr. 712.  She alleged that her service connected disabilities prevented her from working since that time.  Tr. 712.

Regarding her activities, Zheng reported increased reliance on her husband due to forgetfulness, distractibility, and disorganization; she mentioned that at times she had lost her belongings and had left a phone on top of the car, causing it to break.  Tr. 716.  She alleged

making mistakes and incurring late fees with finances; she said currently her husband managed all family finances.  *Id*.  She stated needing reminders to take vitamins and having to write down appointments.  *Id*.  She said she left the stove on "one or two times." *Id*.  She indicated that she cleaned and did laundry twice a week, grocery shopping three times a week, and childcare seven days a week.  *Id*.  She reported that she completed self-care and personal hygiene tasks, but said that in the past, after returning from service, she had feelings of depression during which she did not get up to shower, change, or brush her teeth.  *Id*.

She also reported that, since returning from the service, she avoided all forms of public transportation, and did not trust large crowds.  *Id*.  She reported withdrawing socially and having strained family relationships.  *Id*.  She said she lost interest in prior hobbies and spent most of her time watching television or caring for her daughter.  *Id*.  Her mental status examination revealed generally normal speech, which at times was somewhat rapid or pressured, a mildly tense, anxious, dysphoric affect with some fidgeting and restless behavior at times, though she also evidenced some lethargic motor behavior and psychomotor slowing; a reported very anxious mood; and minimally impaired attention and concentration and recent memory.  Tr. 715.  Despite some mild signs of depression and anxiety, Zheng was cooperative, polite, pleasant, positive and had an adequate manner of relating, social skills, and overall presentation. Tr. 714.  She also had good hygiene and fair grooming.  *Id*.

Moreover, she was articulate and had fully intact capacities for expressive and receptive speech.  Tr. 715.  Her thought process was coherent and goal-directed.  *Id*.  She reported that an imminent pregnancy due date was disrupting her concentration; she counted to 20, performed calculations, self-corrected two errors during serial sevens from 100 while using her fingers and taking extended time, completed serial threes from 20 with one instruction reminder and spelled

"world" backward on the first attempt.  Tr. 715.  She recalled three of three objects immediately, two of three independently after a delay and three of three after a category reminder and also recalled six digits forward and four backward.  Tr. 715.  Dr. Savidge assessed Zheng's intellectual functioning as average to above average. Tr. 716.

Dr. Savidge diagnosed PTSD with Panic Attacks and Major Depressive Disorder, recurrent, moderate and without psychotic features, and opined that Zheng had moderate limitations in regulating emotions, controlling behaviors, and maintaining wellbeing; and mild limitations in interacting adequately with supervisors, co-workers, and the public, sustaining an ordinary routine and regular attendance, maintaining concentration and performing at a consistent pace, being aware of normal hazards and taking appropriate precautions, maintaining personal hygiene and appropriate attire, and understanding, remembering, and applying complex directions and instructions.  Tr. 716-17.  She indicated that Zheng had no limitations in understanding, remembering, and applying simple directions and instructions or using reason and judgment for work-related decisions.  Tr. 716.

### C.      The Non-Examining State-Agency Consultants

On September 16, 2020, non-examining state-agency psychiatric consultant, Anne Stockton, M.D. ("Stockton"), reviewed medical Exhibits 1F through 3F.[6] Tr. 83-84, 646-47.  Dr. Stockton never reviewed Exhibits 5F through 18F.[7] Tr. 648-1314.  Those records include, among

---

[6] According to the table of contents provided in the Administrative Record, 1F-3F are Outpatient Medical Records covering period dated 06/01/2017 to 06/04/2020 from NHC Cherry Point, Emergency Department Records dated 06/15/2020 from Franklin General Hospital and Outpatient Medical Records covering period dated 11/15/2019 to 08/06/2020 from Northport VA.

[7] 5F to 18F include Outpatient Medical Records covering period dated 08/04/2020 to 09/23/2020 from Northport VA, the DDS Medical Evaluation Document dated 10/05/2020, the CE Internal Medicine record dated 01/27/2021 from Andrea Pollack, DO, the CE Psychiatry report dated 01/27/2021 from Dana Savidge, PsyD, Outpatient Medical Records covering period dated 01/01/2020 to 04/05/2021 from NYU Langone, DDS Medical Evaluation Document dated 04/07/202, DDS Medical Evaluation Document dated 04/12/2021, Outpatient Medical Records covering period dated 09/23/2020 to 07/02/2021 from Northport, Office Treatment Records dated 01/01/2020 to 07/25/2021 from Dr. Joseph Elchenbaum, Outpatient Medical Records covering period dated 07/08/2021 to

other things, Dr. Linardatos' records.  Nonetheless, based on her review of Exhibits 1F-3F, Dr. Stockton noted that Zheng had been diagnosed with Adjustment Disorder with Mixed Anxiety and Depression.  Tr. 646.  Dr. Stockton further opined that Zheng was moderately limited in her ability to accept instructions, respond appropriately to criticism from supervisors, and get along with co-workers or peers without distracting them or exhibiting behavioral extremes.  Tr. 83. However, in the narrative section that constitutes the actual mental residual functional capacity assessment, Dr. Stockton opined that Zheng would be able to sustain attention and concentration, interact appropriately with coworkers and supervisors, and adapt to changes in the work environment.  Tr. 84.

Dr. Stockton also noted that recent psychotherapy notes mentioned that Zheng reported feeling hopeless during arguments with her husband, had a history of a suicide attempt in 2015, and reported general anxiety, fearfulness, discomfort in large crowds, and being somewhat socially withdrawn.  *Id*.  Dr. Stockton further considered the fact that the notes she reviewed indicated that Zheng did not have active suicidal ideation.  *Id*.  Indeed, she indicated that the notes she reviewed also showed that Zheng had a euthymic mood, was adequately attentive, had a logical thought process, and had an appropriate affect.  *Id*.  In addition, she stated that Zheng was capable of traveling alone and driving herself and highlighted that she was caring for her two-year-old daughter and did household chores.  *Id*.

On October 5, 2020, a non-examining state-agency medical consultant, D. Schwartz, M.D. ("Schwartz"), reviewed medical Exhibits 1F through 3F and 5F.  Tr. 81-82, 704-05.  Dr. Schwartz also failed to review Exhibits 7F through 18F.  Tr. 706-1314.  Dr. Schwartz opined that

---

11/15/2021 from Northport VA, Outpatient Medical Records covering period dated 06/14/2021 to 10/05/2021 from Northport VA, Outpatient Medical Records covering period dated 11/22/2021 to 01/28/2022 from Northport VA, Medical Evidence of Record dated 04/05/2022 from Dr. Efthia Linardatos and Hospital Records dated 04/05/2019 from Dr. Rodwan Mahfou.

Zheng was limited to lifting/carrying up to 10 lbs. frequently and 20 lbs. occasionally; sitting for six hours; and standing/walking for up to six hours.  Tr. 81-82, 704.

On April 7, 2021, a second non-examining state-agency psychiatric consultant, Carl Anderson, M.D. ("Anderson"), reviewed Exhibits 1F through 9F, but never reviewed Exhibits 12F to 18F.  Tr. 95-101, 974-75.  In the list of questions in the form he used, which specify that it is not the actual mental residual functional capacity assessment, Dr. Anderson opined that Zheng was moderately limited in her abilities to accept instruction, respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  Tr. 100.  However, in the narrative section that constitutes the actual mental residual functional capacity assessment, he opined that she would be able to sustain attention and concentration, interact appropriately with coworkers and supervisors, and adapt to changes in the work environment.  Tr. 101.  Among other evidence, Dr. Anderson considered the consultative evaluation by Dr. Savidge.  Tr. 100-01.

On April 12, 2021, a second non-examining state-agency medical consultant, Wallace Wells, M.D. ("Wells"), reviewed Exhibits 1F to 9F, but never reviewed Exhibits 12F to 18F.  Tr. 94-95, 976-77.  As noted above, Exhibits 12F to 18F include, among other things,  Dr. Linardatos' notes.  Dr. Wells opined that Zheng's physical impairments were not severe.  Tr. 95-96.

## 2.     Procedural History and Relevant Non-medical Evidence

On December 10, 2019, Zheng filed a Title II application for disability insurance benefits alleging a disability beginning June 1, 2018, the day before she gave birth to her first child.  Her claim was initially denied on October 7, 2020.  It was also denied upon reconsideration on April 14, 2021.  Thereafter, Zheng filed a written request for a hearing, which was received on June

13, 2021.  On April 13, 2022, Administrative Law Judge Brian J. Crawley ("the ALJ") held a telephone hearing.

During the hearing, Zheng testified that she lived with her husband and two children, ages 3 and 1 at the time.  Tr. 49.  She indicated that after being discharged from the military, she began attending school.  *Id.*  To this end, she noted that she went back to school because she was "try[ing] to pay for my child's medical bills because both my children have medical issues." Tr. 50.  She also stated that she had sought vocational rehabilitation but was denied assistance.  Tr. 49.

Zheng further reported that she had graduated college in 2020, but then had to seek mental health treatment and "was dealing with [her] first kid." Tr. 49, 50.  At the time of the hearing, she was attending St. John's University for an MBA in finance.  *Id.*  She indicated that she was taking four classes (i.e., full-time), but only one class was in-person - the rest were online.  Tr. 50.  She stated that she was supposed to graduate that year.  *Id.*  Zheng was asked questions about her grades and indicated that her GPA for her bachelor's degree was at least 3.4, but that she was actually struggling with class at the time of the hearing.  Tr. 51.  She stated, however, that she was "almost done with [the] semester" and then was "thinking about stopping school [and] just [dealing] with [her ] children and [her] mental health.  *Id.*

During the hearing, Zheng testified that she cannot work because of her anxiety disorder.  *Id.*  She indicated that she has difficulty with daily life, particularly with socializing, her memory, and reacting to stressful situations.  *Id.*  Specifically, she averred:

> [E]ven minor stress, even the lowest stress can kind of trigger my anxiety sometimes. And I am dealing with it at the moment.  I am seeking help.  I am also taking medications for it, but I am going to school and I know that['s] . . . contradicting but am doing it because I need to pay for my children's bills.  I am forcing myself out of my comfort zone, out of my own, you know, my own health.

Tr. 52.  At the time of the hearing, Zheng was being treated weekly for anxiety.  *Id*.  Indeed, she

indicated that she had been seeing Dr. Linardatos for about a year.  *Id*.  Zheng was also seeing a

psychiatrist once a month, who prescribed her medications.  Tr. 53.  To this end, she explained:

> I'm on Zoloft . . .because I'm currently breastfeeding an infant and I requested
> that I be on a medication that won't [INAUDIBLE, but presumably, affect] my
> breastfeeding. It's helping to a certain extent. I am on the full dosage now. I
> was on the lower dosage before, but I do feel it's helping . . ..

Tr. 53-54.  As for side-effects, Zheng said she experiences nausea and "feeling faintness," but

she was not sure if it was caused by the medicine or another health issue.  Tr. 54.

Zheng further testified that she also has difficulty sleeping.  *Id*.  She indicated that her

husband works from home and helps take care of her and the children during the day.  *Id*.

She stated that she tries her "best in order to help out," but "when kids tend to, you know, not

listen or when they're dealing with, you know, the medical issues, it's very hard to deal with

stress, like, and even in general for me." Tr. 54-55.  To help relieve her symptoms, Zheng said "I

do walk away and I do let my husband know that I can't deal with it right now or at the moment.

I do go to my room or I just walk outside. Wherever I get my solitude.  I just go..." Tr. 55.

Zheng also noted that psychotherapy was not as helpful as she hoped and she had been

looking for a new therapist.  *Id*.  She had also signed up for group therapy but it had not yet

started.  *Id.*  Zheng stated that on a typical day, her husband and children are usually awake

before her.  Tr. 55-56.  She has coffee and tells her husband she can care for the children, but she

stated that "in [all] honesty, he helps out every minute that he can." Tr. 56.  She said she tries to

make the children breakfast, lets them watch television, and then she lays down on the couch. *Id*.

Her husband checks on her and the children. *Id*. With respect to childcare, Zheng also testified

that her mother-in-law and brother, who lived with her family, helped her with the children. Tr.

62. Her mother was also helping her with the children. *Id*.

Zheng stated that she does her schoolwork when she is not able to sleep at night –

including her online classes. *Id*. She tries to write lists of her assignments and work because she

cannot remember them, but she noted that "sometimes that doesn't help because I actually

missed a quiz recently and had to [tell]my professor that I missed it," and had to re-take it. *Id*.

Zheng further testified that sometimes she does her work, and sometimes she does not, but she

works with a group of students who divide up the work and "help [her] out." *Id*. With respect to

her in person classes, Zheng said she just sits in class and that class did not have much assigned

work and all of it was "group teamwork." Tr. 56-57. To this end, Zheng noted that she

communicates with her student team via email, telephone and sometimes in person. Tr. 57. She

said the other students help her out "because they know that that's either this part's not done

yet or my part's not done and they have to remind me." *Id*.

When the ALJ asked Zheng how she expected to perform "relatively complex" work that

utilized "the things that [she] learned" in her MBA program, she responded:

> Well, when I actually chose the degree, it wasn't really something that I chose
> expecting to kind of do outside after I graduated. But I wanted to do
> something that would help me improve myself. Something maybe that . . . I
> can do to help . . . my family and me out possibly in the future. But I don't
> think that's working out for me at the moment because of everything that's
> going on with me.

Tr. 58.

Zheng indicated at the hearing that she has a driver's license but does not drive and her

husband drives her to her appointments. Tr. 58, 59. She said that her husband does not trust her

to drive because he thinks she drives "dangerously." Tr. 59. She further indicated that her

husband usually washes the dishes, does the laundry and does the shopping.  Tr. 59-60.  In fact, Zheng testified at the hearing that she does not clean her home and only cooks for the kids in the morning.  *Id*.  She stated that when they go shopping, she stays in the car with the children while her husband shops.  Tr. 60.

With respect to her personal care, Zheng testified that she does not get dressed every day.  *Id*.  Specifically, she stated that she gets dressed "Only if I have to." Tr. 61.  Zheng also stated that she does not shower/bathe regularly.  *Id*.  To this end, she noted that she only bathes "every few days," and sometimes needs to be reminded to do so.  *Id*.  She further indicated that she [does not] take care of [her] hair . . . or nails because [she doesn't] feel like there's a need for it.  Tr. 61.  Finally, Zheng stated that she does not have any hobbies or "any fun." Tr. 61-62.

Zheng was then asked about her military service.  Zheng testified that she joined the Marines at age 17.  Tr. 63.  She said she was "motivated to join and be part of the community and the military and also because of the benefits," to get an education, and to be independent.  *Id*.  She said that she did not have any mental health issues prior to joining the military.  *Id*.  While in service, she kept records and tracked flight hours.  Tr. 64.  Zheng then explained the problems she had in the Marines:

> When I was in the military, my supervisor and my employees were, they were very difficult, I believe to work with. You know, they were saying a lot of the sexist and racist jokes that were funny to them. And when something bad would go wrong or maybe I didn't follow their orders properly or whatever it is that they were instructing me to do when it's something that I didn't do, you know, if there was something that was [] major, like, if I didn't document properly or something of that sort, my supervisor would yell at me in front of everyone.

*Id*.

Zheng was then asked about her children's health issues.  Zheng stated that both children have asthma and her older child's asthma is severe.  Tr. 65.  She said the steroids were making

her oldest daughter's asthma worse and her insurance would not cover the Chinese medicine

treatment that helps her daughter.  *Id.*  She indicated that her younger daughter has less severe

asthma, but she also has "intestinal issues that causes her to have bloody stools or have, like

intestinal issues because of intolerances or allergies to food." *Id.*  In addition, her younger

daughter cannot go to sleep by herself.  *Id.*  Zheng explained that, by going to school full-time,

the assistance she receives as a veteran helps pay for her children's medical bills:

> The GI bill pays something call[ed] the VAH, I believe, that pays you money
> to go to school full-time.  And if you go part-time, it doesn't pay for the full
> benefits and I'm trying to go for the full benefits because I pay for my
> children's medical bills.  And every month, I believe, it's close to $1,500 just
> for her medication which is limited.  So, if I need more medication out of the
> amount, but that's about for a couple months and the total so far is at least
> $10,000 just for her medications alone so far which she's still using.

Tr. 66.

Zheng stated that she does not get a lot of sleep at night and is very tired throughout the

day.  *Id*.  She said she experiences panic attacks, explaining:

> It's hard to breathe.  My heart palpitates really fast. I know that I have
> tachycardia where the heart already beats rapidly sometimes.  But when I'm
> having a panic attack, it's hard to breathe.  My heart races and it's just like
> [inaudible].

Tr. 67.  She noted that her psychiatrist would like her on different medication, but she is limited

to Zoloft because she is breastfeeding.  *Id.*  She further stated that she last had thoughts of

hurting herself about a month before the hearing.  Tr. 67-8.  Zheng also testified that she has a

difficult time controlling her temper and emotions when having an argument with her husband

and children.  Tr. 68.  Specifically, she stated, "It is "very easy" for [me] to become angry or

"very, very stressed out even if it's something little," when I am having an argument with my

husband or children.  *Id.*

When asked how her impairments had changed since 2018, Zheng explained that when she started therapy, she "was already in a very, very bad place." Tr. 69.  She said her husband had been urging her to seek medical treatment and a therapist, but she could not because she had a child with medical issues, and she "didn't have time for [herself]." *Id*.  She further noted that when her second child was born, "[T]hey said, you really need to go on depressive medication, anxiety medication," and that is when she began treatment.  *Id*.  She indicated that treatment had "helped out a little bit, but [she knew] that [she had] a long way to go because the thing is, [she had been] dealing with a lot of stress with [her] kids and [she tried] very hard . . . to not scream and to express it by just talking.  But [she said it was] very hard and lately, instead of having outbursts, [she] would just walk away. . ." *Id*.  Zheng stated that she did not "want [her] kids to grow up with [her] having these issues because [she didn't] want them to be like [her]." Tr. 69-70.

An impartial vocational expert, Renee Jubrey ("Jubrey"), also appeared at the hearing. Tr. 51.  Jubrey first opined that the closest Dictionary of Occupational Titles (the "DOT") occupation to Marine Aviation Operations, her job in the military, was Data Base Administrator, DOT #039.162-010, a sedentary job with an SVP of 8.  Tr. 70-1.  Jubrey noted that an SVP of 8 corresponded to an occupation that required 4 to 10 years of specific vocational preparation, and thus, Zheng could not have performed that occupation long enough to be considered past relevant work.  Tr. 71.

The ALJ then posed his first hypothetical and asked Jubrey to assume an individual the same age and with the same education and work experience as Zheng who is limited to light work and can sit for six hours; stand/walk for six hours; lift/carry 10 lbs. frequently and 20 lbs. occasionally; be off-task 10% of the day; can perform simple, routine and repetitive tasks;

frequently deal with changes in routine work-setting; and occasionally interact with supervisors, co-workers, and the public. *Id.* Jubrey opined that such an individual would be able to work as a Marker, DOT #209.587-034; a Routing Clerk, DOT #222.687-022; or as a Mail Clerk, DOT #209.687- 026 – all light work with SVPs of 2, respectively with approximately 130,000, 105,000, and 12,000 jobs nationally. Tr. 71-2.

When the ALJ altered the hypothetical to increase the time off-task to 15% of the workday, Jubrey stated that "would rule out employment at the simple level." Tr. 72. Jubrey further opined that if the individual had one unscheduled absence per month, that would also preclude employment. Tr. 72. She explained:

> Well, what I found, I mean the Department of Labor does publish statistics. I've run those by employers over the past 40 years. They tell me that, you know, even once per month on a consistent basis would put the person on progressive discipline. So, by the third month, they would be terminated if that behavior wasn't modified. So, I testify, you know, it's got to be 11 days or less annually.

Tr. 72-3. On cross-examination, Jubrey stated that the occupations of Marker and Routing Clerk did not have strict production quotas, "But I will tell you that you are expected to, you know, remain on task and be productive except for, you know, running to the ladies' room or when you're waiting for that truck." Tr. 74-5.

On May 23, 2022, the ALJ issued his decision, finding that Zheng was not disabled. Tr. 7-25. The ALJ noted that Zheng was insured through December 31, 2023, and that she had not engaged in substantial gainful activity since the alleged onset date of June 1, 2018. Tr. 12. He acknowledged that Zheng had severe impairments that included depressive disorder and anxiety disorder. Tr. 12-13. Indeed, he found that her medically determinable impairments significantly limited her ability to perform basic work activities as required by SSR 85-28. Tr. 12. Nonetheless, the ALJ concluded that Zheng's impairments did not meet or medically equal the

41

severity of a listed impairment.  Tr. 13-14.  Specifically, he noted that her mental impairments did not result in one extreme limitation (the inability to function independently, appropriately, or effectively, and on a sustained basis) or two marked limitations in a broad area of functioning (a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis).  Tr. 13.

The ALJ next assessed Zheng's residual functional capacity ("RFC") and held:

> [T]he undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. [§]404.1567(b) except [she] can sit six hours and stand/walk six hours in an eight-hour day; lift and carry 10 pounds frequently and 20 pounds occasionally; in addition to normal breaks for approximately 54 minutes of each hour or 90% of the workday, equating to 10% off task, the claimant can perform simple, routine, repetitive tasks and can frequently make work-related judgments and decision, frequently deal with changes in routine work setting, and can perform positions that require interaction with supervisors, co-workers and the public occasionally.

Tr. 15.  In reaching this RFC finding, the ALJ stated that he considered Zheng's statements about her symptoms and their intensity and determined the "[Zheng's] medically determinable impairments could reasonably be expected to cause the alleged symptoms . . .," but her "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record . . .." *Id.*  As a result, he found Zheng was not disabled and denied her claim.  Tr. 20.

## DISCUSSION

### 1.    Standards

### A.    Motion for Judgment on the Pleadings

A motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12 (c) should be granted if it is clear from the pleadings that "the moving party is entitled to judgment as a matter of law." *Rojas v. Berryhill,* 368 F. Supp. 3d 668, 669 (S.D.N.Y. 2019*)* (citing *Burns Int'l Sec.*

*Servs., Inc. v. Int'l Union*, 47 F.3d 14, 16 (2d Cir. 1995)).  "The standard for addressing a motion for judgment on the pleadings pursuant to Rule 12(c) is the same as the standard used in evaluating a motion to dismiss under Rule 12(b)(6)." *Id.*  The Court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing a decision of the Commissioner of Social Security, with or without remanding the case for a rehearing." 42 U.S.C. § 405(g**)**.

### B.    Review of ALJ's Decision

In reviewing a decision of the Commissioner of Social Security, a district court may set aside a determination "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole."  *Greek v. Colvin,* 802 F.3d 370, 374-75 (2d Cir. 2015) (citations omitted); *see* 42 U.S.C. § 405(g).  In other words, the findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive, 42 U.S.C. § 405(g), and thus, the reviewing court does not decide the case de novo.  *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004); *see Alvarez v. Comm'r of Soc. Sec.,* No. 20-CV-03963 (WFK), 2023 WL 2464961, at *1 (E.D.N.Y. Mar. 10, 2023)("When a claimant challenges the Social Security Administration's ("SSA") denial of disability benefits, the Court's function is not to evaluate de novo whether the claimant is disabled, but rather to determine 'whether the correct legal standards were applied and whether substantial evidence supports the decision."); *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) ("[I]t is up to the agency, and not [the] court, to weigh the conflicting evidence in the record"); *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (holding that if the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, "even if [the court] might justifiably have reached a different result upon a de novo review").  However, "[s]ubstantial evidence

[means] more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401) (internal quotation marks omitted).

###    C.    The Disability Determination

To be eligible for disability benefits under the Act, a claimant must establish that he, she or they is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than twelve months."  42 U.S.C. § 423(d)(1)(A); *see Kathryn A. v. Comm'r of Soc. Sec.,* No. 3:22-CV-1392 (SDV), 2023 WL 8596012, at *1 (D. Conn. Dec. 12, 2023).  The Act further states that this impairment must be "of such severity that [the claimant] is not only unable to do [his, her, their] previous work but cannot, considering [his, her, their] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A); *see Shaw v. Chater*, 221 F.3d 126, 131-32 (2d Cir. 2000); *Nascimento v. Colvin*, 90 F. Supp. 3d 47, 51 (E.D.N.Y. 2015); *Marinello v. Comm'r of Soc. Sec.*, 98 F. Supp. 3d 588, 592-93 (E.D.N.Y. 2015).

In order to determine whether a claimant is disabled within the meaning of the Act, the Social Security Administration has promulgated regulations prescribing a five-step sequential analysis for evaluating disability claims.  See 20 C.F.R. §§ 404.1520; 416.920.  The Second Circuit has summarized this procedure as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the Commissioner next considers whether the claimant has a 'severe impairment' which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the

> regulations.  If the claimant has such an impairment, the Commissioner will consider him disabled without considering vocational factors such as age, education and work experience . . . .  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant can perform.

*Telavera v. Astrue,* 697 F.3d 145, 151 (2d Cir. 2012).  The claimant bears the burden of proof at steps one through four of the sequential inquiry, while the burden shifts to the Commissioner at step five to show that the claimant is capable of working.  *Id*.  In making these determinations, the Commissioner "must consider four factors '(1) the objective medical facts; (2) diagnosis or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; (4) the claimant's educational background, age, and work experience.'" *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983)(per curiam)); *see also Capezza v. O'Malley*, No. 23-CV-01813 (SDA), 2024 WL 642961, at *8 (S.D.N.Y. Feb. 15, 2024).

### 2.    Analysis

Zheng's primary argument is that the ALJ failed to properly evaluate various conflicting opinions regarding whether she was mentally disabled or to consider all of the evidence in the record.  It is important to note that "'[a]n ALJ is free . . . to choose between properly submitted medical opinions,' and even to 'discount the opinion of a treating physician if it is inconsistent with other substantial evidence.'" *Rushford v. Kijakazi*, No. 23-317, 2023 WL 8946622, at *1 (2d Cir. Dec. 28, 2023) (internal citations omitted).  However, an ALJ must, nonetheless, consider all the medical opinions in the record and "explain how the two 'most important' factors – supportability and consistency[8] – appl[y] to each opinion." *Id*. (citing 20 C.F.R. §

---

[8] "Supportability refers to the extent to which a medical source opinion is supported by objective medical evidence and the medical source's explanations." *Balotti v. Comm'r of Soc. Sec*., 605 F. Supp. 3d 610, 616 (S.D.N.Y. 2022)

404.1520c(b)(2); *see also Balotti v. Comm'r of Soc. Sec.,* 605 F. Supp. 3d 610, 617 (S.D.N.Y. 2022).  In addition, the ALJ is required to discuss other factors including, for example, the relationship of the provider with the claimant, "if there are 'two or more medical opinions or prior administrative medical findings about the same issue [that] are both equally well-supported . . . and consistent with the record . . . but are not exactly the same.'"  *Id.* (citing 20 C.F.R. § 404.1520c(b)(3)).  Based on its review of the record, the Court finds that the ALJ failed to do so.

To begin with, in support of his conclusion that Zheng's psychiatric impairments did not result in a complete disability, the ALJ stated that during "her treatment," Zheng made "statements to her mental health providers denying urgent mental health issues," and indicated that she was attending school in a master's degree program and taking care of her children.  Tr. 13-19.  He also cited to a number of instances where Zheng had normal mental status examinations.  Tr. 15-6.  In fact, he indicated that he was particularly persuaded by the April 2021 report of Olsen, a nurse practitioner, that Zheng was managing well following the birth of her second child.  Tr. 16-17.  He failed, however, to explain why that particular treatment record was more supportable and consistent than the multitude of contrary entries from medical providers that indicated Zheng was feeling anxious, hypervigilant, fearful, sad; was uncomfortable and avoidant of crowded areas and highly reactive to loud noises or that she suffered from significant fatigue and had suicide ideations.  *See e.g.*, Tr. 565-71, 587, 591, 594-95, 633-35, 655-66, 696-99, 740-41, 1002, 1059, 1147, 1160-64, 1180, 1187-88, 1194, 1196-97, 1264-65, 1267-68, 1272, 1256-57, 1264, 1292.

The ALJ also indicated that he was persuaded by the August 2018 records from the U.S. Military, prepared in connection with Zheng's discharge, in which she was found to be fit for full

---

(citing 20 C.F.R. § 404.1520c(c)(1). "Consistency refers to the extent to which a medical source's opinion is consistent with other medical or non-medical sources." *Id*. (citing  20 C.F.R. § 404.1520c(c)(2)).

duty, *i.e.,* not disabled.  Tr. 17.  Yet, he failed to adequately explain why he rejected the May 10,

2020 opinion of the Northport VA, which confirmed that Zheng had a service-connected

disability rated at 90%, that she had been found to be unemployable by the VA and that her

disability was found to be "total and permanent," stating only that different agencies defined

disability in different ways.  *See Loucks v. Kijakazi*, No. 21-1749, 2022 WL 2189293, at *2 (2d

Cir. June 17, 2022) ('[T]he ALJ committed procedural error by failing to explain how it

considered the supportability and consistency of medical opinions in the record.").

In addition, the ALJ discounted a report prepared by Dr. Linardatos, Zheng's treating

physician, which concluded that she was struggling with ongoing mental health challenges and

life stressors that could interfere with her ability to function effectively in the workplace.  The

ALJ complained that Dr. Linardatos spoke only of symptoms Zheng was endorsing,  Yet, Dr.

Linardatos' determination that Zheng suffered from an anxiety disorder and had difficulties with

low mood, poor concentration and memory, anhedonia, irritability, sleep disturbance, feelings of

worthlessness, social withdrawal and difficulty adapting to stressful situations, were largely

consistent with the findings of Dr. Mahfouz, Dr. Carver, Dr. Fitzgerald, Watson-Mott, Dr. Frum-

Vassallo and Dr. Jose.  Tr. 566, 594, 1187-88, 1261-63 1292, 1304, 1311.

Moreover, as he did with the military and VA records, the ALJ cherry-picked Zheng's

treatment records, seemingly disregarding the findings of certain practitioners who opined that

Zheng's anxiety and depression resulted in an "occupational and social impairment with reduced

reliability and productivity," *see e.g.,* Tr. 1306, choosing instead to highlight a small portion of

the April 2019 questionnaire completed by Dr. Mahfouz, in which he found that Zheng did not

have PTSD and only "some" occupational and social impairment.  Tr. 17.  As a result, the ALJ

determined that Zheng's treatment records generally showed "isolated" situational issues and

mild anxiety.  Importantly, the ALJ did so despite Dr. Mahfouz' findings Zheng, nevertheless, met several Criterion for PTSD and suffered from Adjustment Disorder with Mixed Anxiety and Depression, Chronic, and Agoraphobia without Panic Disorder.  Tr. 1294-95.  Although, as was stated above, the ALJ was "free to choose between properly submitted medical opinions," he was, nonetheless, tasked with 'weigh[ing] all of the evidence available to make an RFC finding that [is] consistent with the record as a whole.'" *See Zacharopoulos v. Saul,* No. 19-5075 (GRB), 2021 WL 235630 (E.D.N.Y. Jan. 25, 2021) (citing Matta v. Astrue, 508 F. App'x 53, 56 (2d Cir. 2013).  The ALJ does not appear to have done so in this case.

Finally, it warrants mention that the ALJ afforded substantial weight to the opinion of Dr Savidge, who examined Zheng once, and concluded that while she was diagnosed with PTSD and major depressive disorder, she had only mild limitations.  Tr. 13, 18.  The ALJ also found the opinions of Dr. Schwartz and Dr. Stockton that Zheng remained able to perform light work persuasive, despite the fact that they never examined her and did not review her complete medical record.  While "[a]n ALJ is permitted to take into consideration the opinion of a non-examining source in determining a claimant's RFC, . . . '[b]ecause a treating source [like Dr. Linardatos] examines a claimant directly, [the treating physician] 'may have a better understanding of [a claimant's] impairment(s) . . . than if the medical source only reviews evidence in [a claimant's] folder." *Ting v. Comm'r of Soc. Sec.*, No. 23-CV-1241 (PKC), 2024 WL 815841, at *8 (E.D.N.Y. Feb. 27, 2024)(citing *Soto v. Comm'r of Soc. Sec.*, No. 19-CV-4631 (PKC), 2020 WL 5820566, at *4 (E.D.N.Y. Sept. 30, 2020) (quoting 20 C.F.R. § 404.1520(c)(3)(v)).  As such, "courts ordinarily find that 'RFC determinations that depend entirely on the opinions of non-examining experts and one-time consultative examiners are not supported by substantial evidence.'" *Id.* (*citing Lewis v. Saul,* No. 21-CV-1493 (AMD), 2022

WL 4586241, at *9 (E.D.N.Y. Sept. 29, 2022); *Estrella v. Berryhill*, 925 F.3d 90, 98 (2d Cir. 2019) ("We have frequently 'cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination.'" (citation omitted)); *see also Velazquez v. Barnhart*, 518 F. Supp. 2d 520, 524 (W.D.N.Y. 2007) ("In the context of a psychiatric disability diagnosis, it is improper to rely on the opinion of a non-treating, non-examining doctor because the inherent subjectivity of a psychiatric diagnosis requires the physician rendering the diagnosis to personally observe the patient.").

For all these reasons, the Court remands this matter to the Commissioner for further proceedings.  The Clerk of Court is directed to close the case.

Dated: Central Islip, New York       **SO ORDERED:**
          March 26, 2024

                                             _____/s/_____
                                             ARLENE R. LINDSAY
                                             United States Magistrate Judge